**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JANE ENGLISH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:20CV62 |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jane English, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 9, 13; see also Docket Entry 10 (Plaintiff's Brief); Docket Entry 14 (Defendant's Memorandum); Docket Entry 15 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of June 3, 2016. (Tr. 181-84.) Upon denial of that application initially (Tr. 79-89, 101-04) and on reconsideration (Tr. 90-100,

110-17), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 109).[1] Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 33-78.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 12-28.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 173-80), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

> 1. [Plaintiff] last met the insured status requirements of the . . . Act on June 30, 2016.
>
> 2. [Plaintiff] did not engage in substantial gainful activity during the period from her amended alleged onset date of February 12, 2016 through her date last insured of June 30, 2016.
>
> . . .
>
> 3. Through the date last insured, [Plaintiff] had the following severe impairments: left upper extremity complex regional pain syndrome, type I, with status post cervical stimulator permanent implant on July 25, 2016; and an open reduced [sic] internal fixation (ORIF) of the left scaphoid fracture with graft to nonunion on February 12, 2016.
>
> . . .
>
> 4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met

---

[1] Shortly before Plaintiff's administrative hearing, she amended her alleged onset date from June 3, 2016, to February 12, 2016. (See Tr. 198.)

or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform the full range of light work . . . except she can use the left upper extremity to frequently handle, but not constantly handle.

. . .

6.   Through the date last insured, [Plaintiff] was capable of performing past relevant work as a customer service clerk; salesperson, cosmetics; data entry clerk; cashier/checker; and membership solicitor. This work did not require the performance of work-related activities precluded by [Plaintiff]'s residual functional capacity.

. . .

7.   [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from February 12, 2016, the amended alleged onset date, through June 30, 2016, the date last insured.

(Tr. 17-28 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

3

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a
reviewing court must uphold the factual findings of the ALJ
[underlying the denial of benefits] if they are supported by
substantial evidence and were reached through application of the
correct legal standard." Hines, 453 F.3d at 561 (internal brackets
and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting
Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of
more than a mere scintilla of evidence but may be somewhat less
than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001) (internal brackets and quotation marks omitted). "If
there is evidence to justify a refusal to direct a verdict were the
case before a jury, then there is substantial evidence." Hunter,
993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not
undertake to re-weigh conflicting evidence, make credibility
determinations, or substitute its judgment for that of the [ALJ, as
adopted by the Social Security Commissioner]." Mastro, 270 F.3d at
176 (internal brackets and quotation marks omitted). "Where
conflicting evidence allows reasonable minds to differ as to

4

whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into

_____

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantially identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro,

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]."  Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[5]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

[5] A claimant thus can qualify as disabled via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ's physical [RFC] assessment is not supported by substantial evidence" (Docket Entry 10 at 6 (standard capitalization applied) (bold font and single-spacing omitted)); and

2) "[t]he ALJ failed to follow [Social Security Ruling 03-2p, Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome, 2003 WL 22399117 (Oct. 20, 2003) ('SSR 03-2p')] in evaluating complex regional pain syndrome [('CRPS')] and properly considering the nonexertional effects of pain" (id. at 9 (standard capitalization applied) (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 14 at 13-24.)

### 1. Physical RFC

Plaintiff's first assignment of error maintains that "[t]he ALJ's physical [RFC] assessment is not supported by substantial evidence."  (Docket Entry 10 at 6 (standard capitalization applied) (bold font and single-spacing omitted).)  More specifically,

_____

at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Plaintiff asserts that the ALJ did "not base[ the physical RFC] on medical evidence or opinion," as "[t]he record contains no medical opinions regarding physical RFC from State Agency physicians or consultative examiners." (Id. at 7 (citing Tr. 13, 79-88, 91-100).) According to Plaintiff, "[t]he record evidence supports a finding that [Plaintiff] cannot use her left upper extremity for any sustained activity," as "[s]he cannot lift and carry weight, and she is limited to less than occasional use of the left upper extremity for handling." (Id.; see also id. at 7-8 (describing evidence Plaintiff believes supports greater left upper extremity restrictions in RFC (citing Tr. 57-59, 68-69, 256, 279, 282, 643, 653, 655, 708, 733, 750, 759, 770, 1009)).) Plaintiff maintains that "[t]he ALJ's failure to incorporate [Plaintiff]'s severe handling limitation into her RFC was harmful," because "[t]he VE testified that a limitation to less than occasional use of the non-dominant arm would preclude all of [Plaintiff]'s past relevant work." (Id. at 9 (citing Tr. 75-76).) Plaintiff's contentions miss the mark.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then

9

must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c). An ALJ need not discuss every piece of evidence in making an RFC determination. See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).

As an initial matter, although the ALJ adjudicated the approximately four-and-a-half-month period of time from Plaintiff's amended alleged onset date of February 12, 2016, to her date last insured ("DLI") of June 30, 2016 (see Tr. 28), he also found that, based on record evidence showing significant improvement in Plaintiff's pain after both trial and permanent implantation of a spinal cord stimulator on July 11 and 25, 2016, respectively (see Tr. 284-95, 708, 733), Plaintiff did not "retain the capacity for the [RFC until] August 4, 2016" (Tr. 26 (emphasis added)). Although the ALJ thus found that Plaintiff did not possess an RFC for light work with frequent handling during the nearly six-month period from her amended onset date of February 12, 2016, to August

4, 2016, the ALJ nevertheless did not find Plaintiff disabled because "there [wa]s no <u>continuous period of over 12-months</u> when [Plaintiff] d[id] not retain th[e RFC] that involve[d] any part [of] the period for adjudication from February 12, 2016 through June 30, 2016" (Tr. 20 (emphasis added)).

In light of those findings by the ALJ, Plaintiff's reliance on evidence preceding the trial implantation of her spinal cord stimulator on July 11, 2016 (<u>see</u> Docket Entry 10 at 7-8 (citing Tr. 256, 279, 282, 643, 653, 655)), as well as evidence post-dating June 30, 2017 (i.e., 12 continuous months after her DLI of June 30, 2016) (<u>see</u> <u>id.</u> at 8 (citing Tr. 1009)) to attack the ALJ's RFC finding lacks relevance to the Court's inquiry. Moreover, as discussed more fully below, the ALJ's discussion of the evidence from July 11, 2016, to June 30, 2017, supplies the necessary "accurate and logical bridge," <u>Woods</u>, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and her findings that Plaintiff's left upper extremity impairment qualified as severe (<u>see</u> Tr. 17) but did not, as of <u>August 4, 2016</u> (<u>see</u> Tr. 26), cause limitations greater than the lifting and carrying requirements of light work and frequent handling with the left upper extremity (<u>see</u> Tr. 20).

First, the ALJ's evaluation of Plaintiff's subjective symptom reporting supports the ALJ's finding that, as of <u>August 4, 2016</u>, Plaintiff could perform the lifting, carrying, and handling set

11

forth in the RFC. In that regard, the ALJ expressly acknowledged Plaintiff's testimony that "she was unable to lift or carry because her arm was getting weaker" (Tr. 21), "that she was unable to type because she could not use her hands" (Tr. 22), and that, "if she held things too long[,] then she would drop things because her fingers were weak[ and] . . . felt as though they were sticking together" (id.). However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 26-27.)

In support of that finding, the ALJ remarked that, "in August 2016, six months after the amended alleged onset date, the medical records reflect a substantial elimination of subjective complaints and an [sic] essentially normal physical examinations in July 2016 and August 2016 with use of the cervical stimulator." (Tr. 24 (emphasis added).) The ALJ then found that, "[b]ased on the objective clinical findings on physical examinations and imaging studies and her own subjective reports, [Plaintiff] experienced substantial[ly] increased activities of daily living and her pain was greatly reduced after both the trial of spinal cord stimulator and the permanent placement of the stimulator as reflected in the July 2016 and August 2016 medical treatment notes and group [therapy] notes." (Tr. 26 (emphasis added).) With regard to daily

12

activities, the ALJ noted that Plaintiff "worked part-time walking dogs" (Tr. 22), remained "able to go shopping, drive, cook, and hold a book" (Tr. 23), "could tie her own shoes and button her own buttons" (id.), and remained "able to trim her fingernails without pain," as well as "to wear sleeves" (id.). The ALJ further observed that, in September 2016, Plaintiff "reported that she was getting 75 percent improvement in her pain with the stimulator" and "continued to be happy with her pain relief and excited about the activities she was now able to do" (Tr. 24 (referencing Tr. 737)), that Plaintiff "indicated [in February 2017] that she did not want to turn the stimulator off because she was able to do more than she was before" (id. (referencing Tr. 811)), and that, "[d]uring subsequent visits [in April and July 2017], it was noted that . . . "[t]aking Topomax at night improved her pain," and that she "was starting back to her graduate work as of August 2017" (id. (referencing Tr. 835, 852)). Plaintiff did not challenge any of these findings by the ALJ. (See Docket Entries 10, 15.)[6]

[6] In Plaintiff's Reply, she maintains that her CRPS "symptoms did not resolve with the spinal cord stimulator." (Docket Entry 15 at 3; see also id. at 3-4 (detailing evidence after August 2016 Plaintiff believes reflected continuing disabling symptoms (citing Tr. 750, 753, 762, 770, 811)).) According to Plaintiff, "[t]he brief period of improvement in symptoms that occurred with the initial implanting of the trial [spinal cord stimulator] does not undermine [Plaintiff]'s claim," as "Social Security policy recognizes that many impairments are subject to exacerbation and remission, and temporary remissions do not usually prevent claimants from meeting the 'continuous period' criteria" for disability. (Id. at 4.) That argument falls short, because the ALJ neither found that the spinal cord stimulator "resolve[d]" Plaintiff's symptoms nor that Plaintiff suffered no limitations following implantation of the stimulator. Rather, the ALJ acknowledged Plaintiff's ongoing complaints of pain, altered sensation, and decreased range of motion (see Tr. 25-26), but found that the

13

Second, by merely pointing to record evidence Plaintiff believes supported greater limitations on her abilities to lift, carry, and handle (see Docket Entry 10 at 7-8), she misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's findings regarding Plaintiff's abilities to lift, carry, and handle, and not whether other record evidence weighed against those findings, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Here, the ALJ discussed the following objective medical evidence relating to Plaintiff's left upper extremity impairment during the time period from July 11, 2016, to June 30, 2017:

- at post-operative evaluation following trial implantation of the spinal cord stimulator, "it was noted that [Plaintiff] did not exhibit any pain behaviors[, h]er sensation was intact[, ] she had 5/5 motor strength throughout[,] . . . her left upper extremity was able to be tested without her guarding[, and t]here were no color, sweating, or temperature changes except a decreased size of her

stimulator "greatly reduced" Plaintiff's pain and "substantially increased" Plaintiff's ability to function. (Tr. 26.)

14

left wrist" (Tr. 23 (emphasis added) (referencing Tr. 287));

- "after [Plaintiff] underwent permanent placement of the stimulator, there were no signs of infection and good coverage into her left hand and arm" (id. (emphasis added) (referencing Tr. 289));

- In December 2016 and February 2017, "[p]hysical examinations showed that [Plaintiff] no longer guarded her left upper extremity even though the sensation was altered" (Tr. 24 (emphasis added) (referencing Tr. 775, 793)); and

- "[d]uring subsequent visits [in April and July 2017], it was noted that . . . [h]er stimulator continued to work well and she had good coverage into her left upper extremity" (id. (emphasis added) (referencing Tr. 835, 852)).

That analysis, along with the ALJ's evaluation of Plaintiff's subjective symptom reporting discussed above, provides substantial evidence to support the ALJ's finding that, as of August 4, 2016, Plaintiff retained the RFC to perform light work with frequent handling with the left upper extremity.

Plaintiff nevertheless faults the ALJ for formulating the RFC without "medical opinions regarding physical RFC from State Agency physicians or consultative examiners" (Docket Entry 10 at 7 (citing Tr. 13, 79-88, 91-100)), arguing that the absence of such opinions renders the RFC "[un]supported by substantial evidence" (id. at 6-7).[7]  However, as the Commissioner explains, RFC

_____

[7] A single decision-maker ("SDM"), i.e., a non-medical source, provided the initial-level determination (see Tr. 79-88) and thus the ALJ neither considered nor weighed that determination (see Tr. 27).  The reconsideration-level physician found insufficient evidence to assess Plaintiff's physical RFC.  (See Tr. 94-95.)

15

constitutes "an administrative finding, not [a] medical assessment," and "the responsibility for assessing a plaintiff's RFC rests solely with the ALJ, [and] not with any particular medical source." (Docket Entry 14 at 15 (citing 20 C.F.R. § 404.1546(c)).) As a result, "[t]he ALJ was not required to obtain an expert medical opinion as to [Plaintiff]'s RFC." Felton-Miller v. Astrue, 459 F. App'x 226, 231 (4th Cir. 2011); see also Wykle v. Saul, No. 1:19CV155, 2020 WL 697445, at *6 (W.D.N.C. Feb. 11, 2020) (unpublished) (holding, in case where state agency medical consultants found insufficient medical evidence before the claimant's DLI to render opinion on the claimant's RFC, that "there is no requirement that an ALJ base his RFC finding, or any particular limitation in it, on a medical opinion" (citing Felton-Miller, 459 F. App'x at 230-31)); Moore v. Colvin, No. 15CV425, 2016 WL 1714117 (D.S.C. Apr. 29, 2016) (unpublished) (holding that "the ALJ is not required to rely on medical opinions to formulate an RFC assessment, as the 'ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision'" (quoting Chandler v. Commissioner of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011))). As discussed above, the ALJ sufficiently supported the RFC with her discussion of Plaintiff's subjective symptom reporting and the objective medical evidence.

16

As the Court can trace the path of the ALJ's reasoning with regard to Plaintiff's abilities to lift, carry, and handle, Plaintiff's first issue on review falls short.

## 2. Non-Exertional Effects of Pain

In Plaintiff's second and final issue on review, she faults the ALJ for "fail[ing] to follow SSR 03-2p in evaluating [CRPS] and properly considering the nonexertional effects of pain." (Docket Entry 10 at 9 (standard capitalization applied) (bold font and single-spacing omitted); see also Docket Entry 15 at 5-6.) According to Plaintiff, "SSR 03-2p states that psychological manifestations related to []CRPS should be evaluated under the mental disorders listings," but that "the ALJ . . . instead[ ] considered only [Plaintiff]'s history of attention deficit hyperactivity disorder [('ADHD'), ] bulimia and anorexia." (Docket Entry 10 at 9 (referencing Tr. 16); see also id. at 10 (noting ALJ's finding that Plaintiff "had no more than a mild limitation due to symptoms of her medically determinable mental impairments" (quoting Tr. 19 (emphasis added by Plaintiff)).) Plaintiff further contends that the ALJ improperly discounted opinions regarding the non-exertional effects of Plaintiff's pain from 1) her treating pain psychologist Dr. Miriam H. Feliu (see id. at 10-12), 2) Plaintiff's history professor Dr. Jerry Gershenhorn (see id. at 12-14), and 3) her fiancé Jeremiah Minion (see id. at 14-15). Plaintiff deems the ALJ's above-described errors "harmful," because

"[a]ll [] jobs relied upon by the ALJ to support her finding that [Plaintiff] is not disabled are at least semi-skilled" (id. at 12 (citing Tr. 24)), and "the VE testified that being off-task more than 10% of a workday or missing more than two days of work per month would preclude competitive employment" (id. (citing Tr. 76)). Those arguments do not warrant reversal or remand.

a.   SSR 03-2p

As Plaintiff argues (see Docket Entry 10 at 9), SSR 03-2p recognizes the adverse impact that an individual's CRPS may have on his or her ability to function mentally:

> Chronic pain and many of the medications prescribed to treat it may affect an individual's ability to maintain attention and concentration, as well as adversely affect his or her cognition, mood, and behavior, and may even reduce motor reaction times.  These factors can interfere with an individual's ability to sustain work activity over time, or preclude sustained work activity altogether.  When evaluating duration and severity, as well as when evaluating RFC, the effects of chronic pain and the use of pain medications must be carefully considered. . . .  Psychological manifestations related to []CRPS should be evaluated under the mental disorders listings, and consideration should be given as to whether the individual's impairment(s) meets or equals the severity of a mental listing.

SSR 03-2p, 2003 WL 22399117, at *5-6 (emphasis added).

Here, however, the ALJ's decision demonstrates that she complied with the above-emphasized directive of SSR 03-2p.  The ALJ expressly evaluated the impact of Plaintiff's mental symptoms on her ability to maintain concentration, persistence, or pace ("CPP") as follows:

18

In [CPP], [Plaintiff] had no more than a mild limitation due to symptoms of her medically determinable mental impairments. It was noted that [Plaintiff] was able to work two part-time jobs as dog/house sitter and pool attendant. During this relevant period, she testified that she was able to drive herself places during the daytime, and the self-imposed limitation for driving in the evenings was due to a physical limitation, not mental symptoms. Importantly, in June 2016, the psychological assessment showed average range of impulsiveness and made no mention of concern with her ability to attend and complete the self-reported questionnaires or her focus in conversations during this evaluation.

(Tr. 19 (internal parenthetical citation omitted) (citing Tr. 296-302).) The fact that the ALJ did not explicitly state that he considered the impact of pain on Plaintiff's ability to concentrate does not render his analysis violative of SSR 03-2p. Plaintiff's ability to maintain her CPP well enough to hold two part-time jobs and drive do not depend on the source of her CPP deficits, i.e., her CRPS pain versus her ADHD, anorexia, bulimia, depression, or anxiety. Moreover, in finding mild deficits in CPP, the ALJ expressly relied upon findings relating to CPP in Plaintiff's evaluation by Dr. Feliu, a pain psychologist. (Id.; see also Tr. 299 (reflecting Dr. Feliu's observation that Plaintiff remained "attentive and oriented during the interview" (emphasis added)); Tr. 300 (documenting Plaintiff's "[a]verage" score in "[i]mpulsiveness" on the Revised NEO Personality Inventory ("NEO-

PI-R")).)[8]  Thus, Plaintiff has not shown that the ALJ violated SSR 03-2p.

b. <u>Dr. Feliu's Opinions</u>

On a pre-printed questionnaire dated May 21, 2018, Dr. Feliu diagnosed Plaintiff with moderate, recurrent major depressive disorder and anxiety related to her pain, which result in crying spells, depressed mood, difficulties with activities, decreased focus, concentration, and memory, and difficulties with sleep. (<u>See</u> Tr. 1024.)  Dr. Feliu opined that Plaintiff's mental impairments and pain would interfere with her ability to maintain attention sufficiently to perform simple tasks in the workplace (<u>see</u> Tr. 1025), cause Plaintiff to remain off-task for more than 15 percent of the workday (<u>see</u> <u>id.</u>), impair her ability to appropriately handle workplace stresses (<u>see</u> <u>id.</u>), prevent Plaintiff from maintaining a schedule and regular, punctual attendance (<u>see</u> Tr. 1026), and cause her to miss work more than four days per month (<u>see</u> <u>id.</u>).  Dr. Feliu estimated that Plaintiff's limitations had existed since at least February 12, 2016, her amended onset date and the date of her ORIF surgery. (<u>See</u> <u>id.</u>)

---

[8] Significantly, Dr. Feliu noted Plaintiff's attentiveness on June 16, 2016, <u>prior</u> to the significant improvement in Plaintiff's pain after trial and permanent implantation of the spinal cord stimulator on July 11 and 25, 2016, respectively.  (<u>See</u> Tr. 299, 708, 733.)

The ALJ thoroughly discussed the substance of Dr. Feliu's opinions (see Tr. 25-26), and then evaluated and weighed them as follows:

> [Dr. Feliu's] opinion is being given little weight by the [ALJ] because it is <u>not consistent with the psychology doctor's own treatment notes</u>. For example, just prior to the [DLI] in June 2016, Dr. Feliu performed an extensive psychological evaluation and assessed [Plaintiff] as objectively reporting less than average anxiety and depressive symptoms for a comparable age, gender and peer person and average range of impulsiveness [(Tr. 300-01)]. Further, this opinion was given in May 2018 and does <u>not necessarily relate to the medical evidence in the applicable adjudicated period from February through June 2016</u>. In addition, many of the statements of limitation by the Ph.D. were <u>based on [Plaintiff]'s subjective reports of physical pain including limitations that would impact her physical functioning from this condition, which are clearly beyond the expertise of the Ph.D.</u> to assess such physical related work limitations.

(Tr. 26 (emphasis added).) Plaintiff challenges the ALJ's assignment of "little weight" to Dr. Feliu's opinions (id.) on three grounds, none of which carry the day.

First, Plaintiff asserts that Dr. Feliu's opinions warrant "controlling weight pursuant to 20 [C.F.R. § ]404.1527[, a]nd even if not entitled to controlling weight, . . . [then] great weight." (Docket Entry 10 at 11.) According to Plaintiff, "Dr. Feliu is the treating psychologist and a specialist in pain psychology," and "[h]er opinion regarding the effects of pain on [CPP] is <u>uncontradicted</u>." (Id. (emphasis added).) That argument, however, overlooks the opinions of the state agency psychological

21

consultants. (See Tr. 82-83, 94-96.) At the initial level of review, the consultant specifically considered the impact of Plaintiff's pain on her mental functioning:

> [Plaintiff] was noted to have significant physical pain related to an arm injury. The evidence suggests that [Plaintiff] experienced mood fluctuations <u>in response to her pain levels</u>. Prior to undergoing surgery on her arm, [Plaintiff] indicated significant <u>anxiety and fear about having to face pain for the remainder of her life</u>.

(Tr. 83 (emphasis added).) Even considering the impact of Plaintiff's "significant physical pain" on her mental functioning (<u>id.</u>), that consultant rated Plaintiff's limitation in CPP as only "mild" (<u>id.</u>). The reconsideration-level state agency psychological consultant expressly relied on <u>pain</u> psychologist Dr. Feliu's findings during a comprehensive psychological assessment on June 16, 2016, that Plaintiff remained "alert and oriented," "coherent," "able to follow the interview," and "goal directed" (Tr. 96), and similarly assessed Plaintiff's CPP deficit as "mild" (<u>id.</u>). The ALJ accorded "great weight" to the consultants' opinions (Tr. 27) and thus the ALJ specifically credited opinions that contradicted the opinions of Dr. Feliu.

Plaintiff's argument also fails to address the ALJ's finding that Dr. Feliu's opinions lacked consistency "with the psychology doctor's own treatment notes," as well as the ALJ's express notation of Dr. Feliu's observation on June 16, 2016, that Plaintiff "report[ed] less than average anxiety and depressive

22

symptoms . . . and average range of impulsiveness" (Tr. 26 (referencing Tr. 300-01)). (See Docket Entry 10 at 10-12.)[9] The ALJ properly declined to accord Dr. Feliu's opinions controlling weight, as he found that those opinions lacked consistency with Dr. Feliu's own treatment notes. See Craig, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."); see also 20 C.F.R. § 404.1527(c)(2)-(4).

Second, Plaintiff challenges "[t]he ALJ's finding that Dr. Feliu's opinion d[id] not relate to [Plaintiff]'s impairments prior to the DLI" (Docket Entry 10 at 11 (citing Tr. 23)), because "Dr. Feliu specifically stated that [Plaintiff's] limitations ha[d] been in effect since February 12, 2016" (id. at 12). However, merely because Dr. Feliu stated her opinion that Plaintiff's limitations existed as far back in time as February 12, 2016, does not establish that Dr. Feliu adequately supported that opinion, or that the opinion merited deference by the ALJ. Dr. Feliu admitted that she first evaluated Plaintiff on June 16, 2016 (see Tr. 1027; see also Tr. 296-302), over four months after February 12, 2016.

---

[9] After the initial psychological assessment with Dr. Feliu on June 16, 2016, Plaintiff participated in individual therapy sessions with Dr. Feliu on more than 20 occasions from June 27, 2016, to April 24, 2018. (See Tr. 303-05, 767, 770, 825, 834, 850, 851, 867, 868, 886, 962, 972, 973, 1005, 1007, 1019-23.) During those sessions, Dr. Feliu recorded only Plaintiff's subjective complaints and did not document any findings on mental status examination. (See id.)

Furthermore, as the Commissioner notes, "when explaining her proffered limitations, Dr. Feliu used present tense language." (Docket Entry 14 at 22.)  Moreover, on the questionnaire itself, Dr. Feliu did not clarify the basis for her opinion prior to June 16, 2016.  (See Tr. 1026.)  Under those circumstances, the ALJ did not err by discounting Dr. Feliu's opinion, in part, because it did not adequately address the time period between February 12, 2016, and June 30, 2016.  (See Tr. 26.)

Third, Plaintiff contests "[t]he ALJ's contention that assessing the vocational impact of pain is 'beyond the expertise' of a pain psychologist" (Docket Entry 10 at 12 (quoting Tr. 26)), and maintains that "Dr. Feliu's opinion evidence is exactly the type of evidence that SSR 03-2p directs the [ALJ] to seek out in assessing the affects of [CRPS] on a claimant's ability to maintain attention and concentration needed to complete work tasks" (id.). To the extent the ALJ discredited Dr. Feliu's opinions because she based them on Plaintiff's subjective complaints of pain (see Tr. 26), the ALJ did not err.  As discussed above, during individual therapy sessions, Dr. Feliu recorded only Plaintiff's subjective complaints and did not document any findings on mental status examination. (See Tr. 303-05, 767, 770, 825, 834, 850, 851, 867, 868, 886, 962, 972, 973, 1005, 1007, 1019-23.)  However, to the extent the ALJ faulted Dr. Feliu for offering "limitations that would impact [Plaintiff's] physical functioning" and/or "physical

24

related work limitations" (Tr. 26 (emphasis added)), the ALJ erred. Although Dr. Feliu mentioned that Plaintiff's chronic pain caused physical issues like "difficulties [with] activities" (Tr. 1024), Dr. Feliu did not offer <u>physical</u> work-related limitations, such as limitations on lifting, carrying, postural movements, and manipulative movements (<u>see</u> Tr. 1024-27). However, because the ALJ based his discounting of Dr. Feliu's opinions on three other reasons supported by substantial evidence, the ALJ's error in that regard qualifies as harmless. <u>See</u> <u>McNeill v. Berryhill</u>, No. 1:16CV1081, 2017 WL 1184187, at *8 (M.D.N.C. Mar. 29, 2017) (unpublished) ("Given the ALJ's other bases for discounting [the treating physician]'s opinions . . ., the ALJ's improper reliance on his personal observations of [the p]laintiff did not render his analysis of those opinions unsupported by substantial evidence."), <u>recommendation adopted</u>, slip op. (M.D.N.C. Apr. 24, 2017) (Eagles, J.); <u>Foster v. Colvin</u>, No. CIV.A. 6:13-926, 2014 WL 3829016, at *11 (D.S.C. Aug. 4, 2014) (unpublished) (holding that, "even if the ALJ erred by considering whether the statement was prepared in anticipation of litigation, . . . such error was at most harmless as the ALJ gave several valid reasons for discounting [the treating physician's] opinion").

c.  <u>Professor Gershenhorn's Statements</u>

Professor Gershenhorn addressed a letter to Plaintiff's attorney, dated May 1, 2018, in which he stated that, "[s]tarting

with the spring 2016 semester, [he] ha[d] seen [Plaintiff] in a lot of pain, which ha[d] affected her course work," and that "she had to withdraw from [his] class because of severe pain." (Tr. 242.) In addition, Professor Gershenhorn noted that, in the fall of 2016, Plaintiff "took an incomplete in [his] class[ and ] completed the class later on by emailing in work" and that, in the fall of 2017, Plaintiff "was rarely able to attend [his] class because of severe pain[, ] when she did come to class, she had to leave early[, and s]he was able to complete the class by submitting her work electronically." (Id.) The ALJ accorded "little weight" to Professor Gershenhorn's statements, "because the Professor was only able to observe [Plaintiff] in a very limited capacity and he d[id] not possess the requisite knowledge of a medical professional to know how [Plaintiff]'s impairments would impact her ability to perform work-related activities." (Tr. 27.)

Plaintiff disputes "[t]he ALJ['s] state[ment] that she gave Dr. Gershenhorn's opinion little weight because he observed [Plaintiff] in 'a very limited capacity' and did not know how her impairments would impact her ability to perform work-related activities." (Docket Entry 10 at 13 (quoting Tr. 27).) According to Plaintiff, "Dr. Gershenhorn . . . had observed first-hand the difficulties that [Plaintiff] had performing sedentary work, very few hours per week," and his "statement is fully consistent with

26

[Plaintiff]'s testimony regarding her difficulties completing classwork." (Id. at 13-14.)

The ALJ did not err in discounting Professor Gershenhorn's statements because he "observe[d Plaintiff] in a very limited capacity" and "d[id] not . . . know how [Plaintiff]'s impairments would impact her ability to perform work-related activities." (Tr. 27.) Professor Gershenhorn commented only on Plaintiff's apparent difficulty with sitting in his classroom, and did not offer observations regarding Plaintiff's abilities to perform any of the other work-related physical abilities, such as lifting, carrying, standing, walking, pushing, pulling, and performing postural and manipulative movements. (See Tr. 242.) The ALJ found that Plaintiff retained the RFC to perform light work (see Tr. 20), which entails up to six hours of standing and walking in an eight-hour workday and only a maximum of two hours of sitting, see 20 C.F.R. § 404.1567(b), as well as that Plaintiff remained able to perform light-exertion past relevant work as a customer service clerk, cosmetics salesperson, cashier/checker, and membership solicitor (see Tr. 27). Thus, Professor Gershenhorn's limited observation of Plaintiff's ability to sit constitutes a proper ground on which to discount his statements.

d. Jeremiah Minion's Opinions

Minion dated a "To Whom It May Concern" letter on May 29, 2018, in which he stated that Plaintiff "cannot lift anything or

27

use her left arm for any sort of manual labor," that, after "the
CRPS [] spread to her back, sitting in one place without the aid of
numerous pillows for more than an hour has been very difficult,"
that "[s]ome of the medications that [Plaintiff] is on have an
effect on her focus and memory[ and that s]he becomes distracted
easily," and that "[t]here is simply no possible way that she
w[ould] be able to work a normal job in her present condition."
(Tr. 250.)  The ALJ evaluated and weighed Minion's letter as
follows:

> The third party opinion of [Plaintiff]'s fiancé, Jeremiah
> Minion is being given limited weight by the [ALJ] for the
> same reason as [Plaintiff]'s subjective allegations are
> accorded limited weight.  The statements are inconsistent
> with the objective medical evidence, [Plaintiff]'s
> treatment course documents, activities of daily living,
> and even [Minion's] own affirmations to providers that
> [Plaintiff's] functional activities of daily living had
> greatly increased due to her greatly reduced pain as a
> result of her spinal cord stimulator trial in July 2016.
> Therefore, [Minion's] current comments from May 2018
> directly contradict his own statements made around July
> 2016, which is much closer and material to the relevant
> time period at issue in this case.

(Tr. 27 (emphasis added).)

Plaintiff objects to the ALJ's decision to "g[i]ve 'limited
weight' to [Minion's] opinion because his statement 'directly
contradict[s]' prior statements" (Docket Entry 10 at 15 (quoting
Tr. 27)), because the ALJ "failed to identify any such statements"
(id.).  As the above-emphasized language makes clear, however, the
ALJ did identify Minion's prior inconsistent statements – the ALJ

28

expressly discussed Minion's statement to the Duke Pain Clinic treatment provider on July 18, 2016, that he "[wa]s in agreement that [Plaintiff's] mood and activity w[ere] much better" after trial implantation of the spinal cord stimulator. (Tr. 284.) The ALJ also correctly observed that Minion's statement in July 2016 "[wa]s much closer and material to the relevant time period at issue in th[e] case" than Minion's statements in his May 2018 letter. (Tr. 27.) Indeed, as Minion made clear in his letter, he described Plaintiff's limitations "in her <u>present</u> condition" (Tr. 250 (emphasis added)), i.e., in May 2018, rather than during the period of adjudication.

For the above-stated reasons, Plaintiff has failed to show that the ALJ improperly evaluated the non-exertional effects of Plaintiff's pain, and the Court should decline to grant relief on this assignment of error.

## III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for

Judgment (Docket Entry 9) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that judgment be entered dismissing this action.


                              /s/ L. Patrick Auld
                             **L. Patrick Auld**
                    **United States Magistrate Judge**


February 22, 2021